RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0207p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

FRANK J. LAWRENCE, JR.,

      *Plaintiff-Appellant,*

*v.*

     No. 07-1026

JANET K. WELCH, et al.,

      *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Michigan at Lansing.
No. 06-00134—Richard A. Enslen, District Judge.

Argued:  November 29, 2007

Decided and Filed:  June 3, 2008

Before:  ROGERS and SUTTON, Circuit Judges; BERTELSMAN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Dennis B. Dubuc, ESSEX PARK LAW OFFICE, South Lyon, Michigan, for Appellant. Richard C. Kraus, FOSTER, SWIFT, COLLINS & SMITH, Lansing, Michigan, Denise C. Barton, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:**  Dennis B. Dubuc, ESSEX PARK LAW OFFICE, South Lyon, Michigan, for Appellant. Richard C. Kraus, FOSTER, SWIFT, COLLINS & SMITH, Lansing, Michigan, Denise C. Barton, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, John R. Oostema, SMITH, HAUGHEY, RICE & ROEGGE, Grand Rapids, Michigan, for Appellees.

     BERTELSMAN, D. J., delivered the opinion of the court.  SUTTON, J. (pp. 9-10), delivered a separate concurring opinion, in which ROGERS, J., joined.

_____

## OPINION

_____

     BERTELSMAN, District Judge.  Plaintiff-Appellant Frank J. Lawrence, Jr. ("Lawrence") appeals from the district court's judgment dismissing his claims filed pursuant to 42 U.S.C. § 1983 against officials of the State Bar of Michigan in connection with their denial of his application for a license to practice law.  For the following reasons, we **AFFIRM**.

_____

[*]The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I. BACKGROUND

Frank J. Lawrence, Jr. graduated from an accredited Michigan law school and passed the Michigan bar exam in 2001. He first applied for a license to practice law in Michigan the same year. For reasons not relevant here, that application was ultimately withdrawn.

Between 2001 and 2004, a contentious relationship developed between Lawrence, the State Bar of Michigan ("SBM"), and the Michigan Board of Law Examiners ("BLE"). In 2003, Lawrence filed a federal lawsuit against the BLE, the SBM, certain of its officials and employees, and justices of the Michigan Supreme Court. *See Lawrence v. Chabot*, 182 Fed. Appx. 442 (6th Cir. 2006). Lawrence sought declarations that certain rules of the state bar were unconstitutional, and he alleged, among other things, that the state bar had violated his First and Fourteenth Amendment rights in processing his 2001 application for admission prior to its withdrawal. The district court dismissed Lawrence's claims on various grounds, and this court affirmed. *Id.*

In 2003, Lawrence also began operating a registered website called "StateBarWatch" on which he actively criticized the SBM and BLE for alleged dishonesty within the Michigan attorney licensing system. Joint Appendix ("J.A.") at 17 (Compl. at ¶ 21).

On August 18, 2004, Lawrence reapplied for admission to the Michigan bar. On August 15, 2005, Lawrence was interviewed by three members of a SBM District Character and Fitness Committee: David H. Baum ("Baum"), Randy A. Musbach ("Musbach"), and Sonal Hope Mithani ("Mithani"). During this interview, Lawrence stated that he had little respect for the Michigan state court system, and he expressed the view that the federal courts are the "guardians of the constitution" and that the Michigan state court system fails adequately to protect individuals' constitutional rights. J.A. at 19 (Compl. ¶ 24).

Following this interview, the District Committee forwarded to the SBM a Report and Recommendation stating: "The Committee does not believe that the applicant, Frank J. Lawrence, Jr., has shown by clear and convincing evidence that he currently possesses the requisite good character and fitness to be recommended to the practice of law in this state." J.A. 278. With respect to the above opinions expressed by Lawrence during his interview, the report stated: "We are concerned about providing a law license to someone who, even before he has handled his first case as a member of the bar, has effectively written off such a huge component of the justice system." J.A. 280.

Following the issuance of this Report and Recommendation, Lawrence made several communications to the employers of the members of the District Committee. He telephoned the University of Michigan Law School, where Baum was the Assistant Dean of Student Affairs. Lawrence told Baum's assistant that he wanted to address the student bar association to let them know how poorly he thought he had been treated. Lawrence also sent a letter to a board member of the legal services organization for which Mithani was a director. In the letter, Lawrence stated how poorly he had been treated and how Mithani had manipulated Lawrence's stated views about the state court system.

The District Committee recommendation was sent directly to the BLE, which voted to accept the recommendation. Lawrence then requested a hearing.

A hearing was held before the BLE on April 20, 2006. Lawrence was questioned about his communications with Baum's and Mithani's employers, but he denied that they were inappropriate. J.A. 37-57. On June 14, 2006, the BLE issued a written opinion denying Lawrence's application for admission to practice law. *Id.* Lawrence did not seek review of this decision in the Michigan Supreme Court.

On September 6, 2006, Lawrence filed a complaint in the United States District Court for the Western District of Michigan pursuant to 42 U.S.C. § 1983, naming as defendants John T. Berry, executive director of the SBM, in his official capacity; Louis A. Smith, President of the BLE, in his official capacity; and Baum, Musbach, and Mithani, all in their individual capacities. Lawrence alleged that the BLE's denial of his bar application violated his First and Fourteenth Amendment rights. He sought declaratory and injunctive relief requiring defendants to issue him a license to practice law. Second, and in the alternative, Lawrence sought prospective relief to prohibit defendants from using his protected First Amendment activities as the basis for denying his future applications for a Michigan law license. Finally, the third count sought damages from Baum, Musbach, and Mithani for their alleged retaliation against Lawrence for the exercise of his First and Fourteenth Amendment rights.

Lawrence also filed a motion for a temporary restraining order and preliminary injunction requesting the same relief sought in the first two counts of the complaint.

Defendants filed motions to dismiss. In an opinion dated December 14, 2006, the district court granted those motions and denied Lawrence's motions for preliminary injunctive relief. J.A. 63. The district court held that Lawrence's attack upon the BLE decision denying his bar application was squarely barred by the *Rooker-Feldman* doctrine. Alternatively, the court held that Lawrence's challenge to the constitutionality of the bar admission process had been rejected by this court in Lawrence's prior appeal.

As to Lawrence's second claim, the district court held that a "decision granting prospective relief would necessarily imply that the hearing panel's decision was improper and forbidden by the constitution" and thus was equally barred by *Feldman*. J.A. 67-68. Further, the court held that, due to the discretion involved in such future decisions, an injunction could not be "meaningfully crafted or enforced." J.A. 68. Third, because Lawrence had not yet filed another application for admission, the district court held that the matter was speculative and not ripe for review. *Id.*

Finally, the district court held that Lawrence's claims for damages against the individual District Committee members were barred because those defendants were entitled to absolute quasi-judicial immunity or, alternatively, qualified immunity. *Id.*

Lawrence timely appealed.

## II. ANALYSIS

### A.      *The Rooker-Feldman Doctrine: Counts I and II*

This court reviews *de novo* the district court's ruling that the *Rooker-Feldman* doctrine precluded subject matter jurisdiction. *McCormick v. Braverman*, 451 F.3d 382, 389 (6th Cir. 2006) (citation omitted), *cert. denied*, 128 S. Ct. 41 (2007).

The *Rooker-Feldman* doctrine is based on two United States Supreme Court decisions interpreting 28 U.S.C. § 1257(a). *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). Section 1257(a) states that a final judgment of the highest court of a state may be reviewed by the United States Supreme Court by writ of certiorari. The *Rooker-Feldman* doctrine is based on the negative inference that, if appellate court review of such state judgments is vested in the Supreme Court, then it follows that such review may not be had in the lower federal courts. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283-84 (2005).

In *Exxon*, the Supreme Court recently summarized the *Rooker-Feldman* doctrine:

> The *Rooker-Feldman* doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.

*Id.* at 284.

In the wake of *Exxon*, this circuit has "distinguished between plaintiffs who bring an impermissible attack on a state court judgment – situations in which *Rooker-Feldman* applies – and plaintiffs who assert independent claims before the district court – situations in which *Rooker-Feldman* does not apply." *Pittman v. Cuyahoga County Dep't of Children and Family Serv.*, 241 Fed. Appx. 285, 287 (6th Cir. 2007) (citing *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006)).

In *McCormick*, we explained that the pertinent inquiry after *Exxon* is whether the "source of the injury" upon which plaintiff bases his federal claim is the state court judgment:

> The inquiry then is the source of the injury the plaintiff alleges in the federal complaint. If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim.
>
> . . . .
>
> To the extent that Defendants argue that these claims, even though they do not assert injury from the state court judgments, are "inextricably intertwined" with those judgments so as to fall within the reach of *Rooker-Feldman*, that argument must fail. We first note that it was this exact language that was the source of the pre-*Exxon Mobil* woes as to the application of *Rooker-Feldman*. In addition, the Supreme Court used the phrase "inextricably intertwined" in *Feldman* to describe a claim where the plaintiff asserted an injury from the state court judgment itself . . . . In *Exxon*, the Supreme Court implicitly repudiated the circuits' post-*Feldman* use of the phrase "inextricably intertwined" to extend *Rooker-Feldman* to situations [where] the source of the injury was not the state court judgment. *In short, the phrase "inextricably intertwined" only describes the conclusion that a claim asserts an injury whose source is the state court judgment, a claim that is thus barred by Rooker-Feldman.*

*McCormick*, 451 F.3d at 394-95 (emphasis added).

Applying this distinction, we concluded in *McCormick* that plaintiff's claims that certain defendants committed fraud and misrepresentation in the course of state probate proceedings did not allege an injury caused by the state court judgment and thus were not barred by *Rooker-Feldman*. *Id.* at 392. In contrast, however, plaintiff's claim that the probate court's order of receivership violated her constitutional rights because it effected an unlawful seizure was barred because "the count alleges that the state court order itself was illegal and harmed Plaintiff." *Id.* at 395.

We have applied this "source of the injury" analysis in other recent cases where *Rooker-Feldman* was raised as a bar to the district court's jurisdiction. *See Pittman*, 241 Fed. Appx. at 288 (claims of improper conduct by employees of family services agency not barred by *Rooker-Feldman*

because their actions were independent from juvenile court's custody decision; plaintiff did not seek reversal of custody order); *Loriz v. Connaughton*, 233 Fed. Appx. 469, 474-75 (6th Cir. 2007) (landowners' claims challenging zoning decisions as unconstitutional barred by *Rooker-Feldman*; district court could not grant requested relief without reviewing decisions of state agency and courts and determining that they were improper); *Brown v. First Nationwide Mortgage Co.*, 206 Fed. Appx. 436, 439-40 (6th Cir. 2006) (mortgagor's claims against individuals involved in mortgage foreclosure proceedings not barred; source of injury was defendants' conduct independent from foreclosure decree itself).

### 1.    *Count I*

It is clear that Lawrence's claim that defendants violated his First and Fourteenth Amendment rights by denying his most recent application for admission to practice law in Michigan is a direct attack on a state court judgment and thus barred by *Rooker-Feldman*. Lawrence explicitly seeks a declaration that defendants' decision "impermissibly impinges upon protected federal rights and that Plaintiff is entitled to a license to practice law." J.A. 28 (Compl. ¶ 56). As the Supreme Court held in *Feldman*, the federal courts are without jurisdiction to entertain such a claim. *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476, 487-88 (1983).

Likewise, this circuit has held that similar federal challenges to the denial of bar applications are barred by *Rooker-Feldman*. *See Raymond v. Moyer*, 501 F.3d 548, 554 (6th Cir. 2007); *Dubuc v. Michigan Bd. of Law Examiners*, 342 F.3d 610, 618 (6th Cir. 2003).

### 2.    *Count II*

Lawrence's second claim – in which he seeks prospective injunctive relief barring defendants from denying his future bar applications on allegedly unlawful First Amendment grounds – presents a more difficult question. The first issue raised with respect to this claim is the question of ripeness.[1]

In Lawrence's first appeal to this court, *Lawrence v. Chabot*, 182 Fed. Appx. 442 (6th Cir. 2006), the court held that Lawrence's First Amendment as-applied challenge was not ripe because he "had not been denied admission to the bar." *Id.* at 455. "No injury thus had occurred or was 'certainly impending.'" *Id.*

Now, Lawrence has been denied admission to the bar on grounds which, he asserts, run afoul of the First Amendment. Lawrence has indicated a clear intent to reapply and, as the record reflects, has persisted in the same expressive activity that allegedly resulted in the first denial. Defendants, likewise, have clearly indicated that they consider such activity to render Lawrence of unfit character for admission.

It would, thus, seem that: (1) it is likely that Lawrence will again be denied admission if he engages in the same allegedly protected activity, and that he has a "credible fear of enforcement;" (2) the factual record is perhaps developed as sufficiently as it can be for purposes of a pre-enforcement challenge, and it is certainly developed now in a way that it was not at the time of the *Lawrence v. Chabot* decision; and (3) Lawrence is exposed to hardship in that the alleged violation of his First Amendment rights is causing him to be unable to practice in his chosen profession. *See generally Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002).

No doubt there are contingencies that may mean that the anticipated harm will not come to pass. Given that the denial of the license to practice law is an *ad hoc* decision by a body (the BLE)

---

[1]The concurrence that follows constitutes the majority opinion on this issue of ripeness.

whose composition no doubt changes over time, it could be that a future application will be granted notwithstanding Lawrence's expressive activity.

Nonetheless, weighing these considerations and applying the relaxed standard of ripeness under First Amendment jurisprudence, Lawrence's second claim for relief is ripe for consideration.

Unfortunately for Lawrence, while ripe, this second claim is also barred by *Rooker-Feldman*. At first blush, this may seem not to be the case given that no future application – and thus no denial – has occurred.

However, examined for its substance rather than its form, Lawrence's second claim for relief is premised on the same alleged injury as his first cause of action, i.e., defendants' denial of his bar application on the basis of his allegedly protected First Amendment activities. Lawrence's complaint makes this explicit: "Therefore, Plaintiff relies upon the allegations in this Complaint relating to how Plaintiff's bar application was processed, to support this Count for prospective relief." J.A. 29 (Compl. ¶ 58).

In other words, the district court could not have concluded that Lawrence was entitled to the prospective relief he seeks – that is, an order enjoining defendants from doing what they did before – without first finding that defendant's previous decision was unconstitutional. Put another way, while the redress Lawrence seeks in his second cause of action is forward-looking, the claim is nonetheless premised on the same past injury: the allegedly unlawful reasoning used to deny him bar admission in 2006.

In *Loriz v. Connaughton*, 233 Fed. Appx. 469 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1241 (2008), we affirmed the district court's ruling that the plaintiffs' claims for damages as well as declaratory and prospective injunctive relief were barred by *Rooker-Feldman*. The plaintiffs there owned a farm in Ohio, and the owners of an adjacent lot applied for a zoning variance in order to operate a commercial bird hunting operation, including a shooting range. *Id.* at 470. After that application was approved by the Ohio Department of Natural Resources Division of Wildlife and, ultimately, the Butler County Board of Zoning Appeals, the plaintiffs appealed to the Butler County Court of Common Pleas. That court remanded the matter for further hearings and findings after which the zoning board and Court of Common Pleas again approved the conditional use permit for operation of the shooting range. *Id.* at 471.

After an unsuccessful appeal to the Ohio Court of Appeals, the plaintiffs filed suit in federal court against various state officials and others alleging, among other things, that the approval and operation of the shooting range constituted a taking of their property in violation of the Fifth Amendment. The district court dismissed the action, in part, due to lack of jurisdiction based on *Rooker-Feldman*, finding that the action essentially sought federal district court review over the decisions of the Ohio courts upholding the zoning permits. *Id.* at 474.

On appeal, this court affirmed, not only as to plaintiffs' claim for damages, but also as to their request for a permanent injunction barring the zoning officials from permitting such shooting range operations in the future:

> Clearly, all of the Lorizes' claims were inextricably intertwined with the state court decisions. In order for the district court to grant the requested declaratory *or injunctive relief*, or to award damages, *the district court would be forced to review the decisions of the Ohio Division of Wildlife, the BZA, the Ohio Court of Common Pleas, and the Ohio appellate court.* Moreover, the relief the Lorizes seek – a declaration that the state courts reached an improper result based on a faulty application of the law – is not a general challenge to the constitutionality of the state

law, but rather a specific grievance over specific decisions. These claims are exactly the type the *Rooker-Feldman* doctrine intended to bar in the lower federal courts.

*Id.* at 475 (emphasis added).

Other circuits have applied similar reasoning to conclude that claims seeking injunctive relief are barred by *Rooker-Feldman* if they necessarily require the federal court to determine that a state court judgment was erroneously entered. *See Mann v. Boatright*, 477 F.3d 1140, 1147 (10th Cir. 2007) (holding that plaintiffs' prayer for permanent enjoinment of allegedly unconstitutional probate order barred by *Rooker-Feldman*), *cert. denied*, 128 S. Ct. 897 (2008); *Mickens v. Tenth Judicial Circuit*, 181 Fed. Appx. 865, 874-75 (11th Cir.) (noting that "the *Rooker-Feldman* doctrine can bar injunctive relief as well as other forms of relief" and holding that district court lacked jurisdiction over plaintiffs' request for preliminary injunction to enjoin mortgage foreclosure sale of their property), *cert. denied*, 127 S. Ct. 834 (2006).

Finally, we note that Lawrence's second cause of action is not outside the scope of *Rooker-Feldman* by virtue of being a "general challenge" to the constitutionality of a state law or rule. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476, 483-86 (1983). Instead, Lawrence's second claim challenges only defendants' application of their admission criteria to him. J.A. 29-30 (Compl. ¶ 61). For this reason, Lawrence's claim is distinguishable from the general challenges to the constitutionality of state court rules in *Dubuc v. Michigan Bd. of Law Examiners*, 342 F.3d 610 (6th Cir. 2003), and *Fieger v. Ferry*, 471 F.3d 637 (6th Cir. 2006).

Thus, because the prospective relief sought by Lawrence can be predicted only on a determination that the prior decision denying him bar admission was improper, his second claim is likewise barred by the *Rooker-Feldman* doctrine.

## B.      *Count III*

In Count III of his complaint, Lawrence seeks damages from individual defendants Baum, Musbach, and Mithani for their alleged retaliation against him by issuing an unfavorable character and fitness recommendation based on his expressed views of the Michigan court system. The district court dismissed this claim for failure to state a cause of action pursuant to Fed. R. Civ. P. 12(b)(6).

We review *de novo* the district court's dismissal for failure to state a claim under Rule 12(b)(6). *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 617 (6th Cir. 2008) (citation omitted).

We conclude that the district court properly found that these three defendants, as members of the State Bar of Michigan's Character and Fitness Committee – and thus agents of the Board of Law Examiners and the Michigan Supreme Court – are entitled to absolute immunity for their actions in investigating Lawrence's character and fitness to practice law and in making recommendations about the same. *See Thomas v. Michigan State Bd. of Law Examiners*, No. 94-1346, 1994 WL 659148, at *2 (6th Cir. Nov. 22, 1994) (individual members of Michigan BLE entitled to absolute judicial immunity from civil rights action for damages arising out of denial of plaintiff's admission to state bar); *Mayfield v. Francks*, No. 92-1012, 1992 WL 73151, at *1 (6th Cir. April 10, 1992) (individuals who conducted character and fitness investigation as part of plaintiff's application to practice law in Michigan are absolutely immune from claim for monetary damages); *Sparks v. Character and Fitness Comm. of Ky.*, 859 F.2d 428, 434 (6th Cir. 1988) (actions taken by members of Kentucky Committee on Character and Fitness in making unfavorable recommendation about plaintiff's fitness to practice law are quasi-judicial, entitling defendants to absolute immunity); *Otrompke v. Chairman of the Comm. on Character and Fitness for the First Judicial Dist. of Illinois*, No. 03 C 7198, 2005 WL 3050618, at *2 (N.D. Ill. Nov. 7, 2005) (dismissing plaintiff's claim against members of character and fitness committee of Illinois bar

alleging violation of procedural due process resulting in their unfavorable recommendation as to his bar application because defendants are entitled to quasi-judicial absolute immunity); *Julien v. Comm. of Bar Examiners for the Practice of Law*, 923 F. Supp. 707, 714-15 (D.V.I. 1996) (similar).

The reasoning of the above cases makes clear that, in conducting the character and fitness examination which is integral to the process of determining whether an applicant is fit to practice law, these individual defendants, acting under the authority of the Michigan Supreme Court, were performing a judicial or quasi-judicial function for which they are entitled to absolute immunity. *See Sparks*, 859 F.2d at 433-34.

For this reason, our dicta in *Dubuc v. Michigan Bd. of Law Examiners*, 342 F.3d 610, 619 n. 4 (6th Cir. 2003), that individual members of the Michigan BLE were not entitled to judicial immunity is distinguishable. There, immunity was denied as to defendants' enforcement of allegedly unconstitutional bar admissions rules regarding a waiting period for reapplication. This ruling was premised on the Supreme Court's holding that enforcement of bar rules is not a judicial function. *See Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719, 734-37 (1980). That holding, however, does not alter the conclusion that determining a particular individual's qualifications and fitness for admission to practice law is an inherently judicial act. *See Sparks*, 859 F.2d at 434.

## III. CONCLUSION

For these reasons, we hold that the district court correctly dismissed Lawrence's claims. We **AFFIRM**.

---

**CONCURRENCE**

---

SUTTON, Circuit Judge, concurring. I wholeheartedly concur in Judge Bertelsman's opinion with respect to his resolution of Lawrence's first and third claims. I write separately to explain my preference for resolving Lawrence's second claim, which seeks to enjoin the Board from denying a second Bar application that Lawrence has yet to file. As to that claim, we ought to affirm the dismissal of the claim on ripeness, not *Rooker-Feldman*, grounds because (1) it is not "fit[] . . . for judicial decision" and (2) "the hardship to the parties of withholding court consideration" is minimal. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

Is the claim fit for judicial review? No, for several reasons. At this juncture, we do not know whether Lawrence will file another Bar application. If he does file a second application, we do not know what he will say in completing the application, how he will respond to questioning in the character and fitness hearing and whether the Board will grant or deny him admission. And if the Board opts to deny the second application, we do not know why it will do so. *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163 (1967). In the absence of concrete facts regarding the Board's affirmative or negative assessment of Lawrence's potential application, any resolution of Lawrence's claim—indeed even the assumption that Lawrence will be injured—is necessarily premature. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003).

Nor has Lawrence shown that he will suffer hardship if he must wait until he files, and the Board rejects, a second application before he seeks to vindicate his First Amendment rights. In the interim, the State has not put his feet to the fire—forcing him to take immediate action or else face the risk of civil or criminal penalties. *See Abbott Labs.*, 387 U.S. at 153 (finding hardship "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious [criminal and civil] penalties attached to non-compliance"); *compare id.*, *with Toilet Goods*, 387 U.S. at 164–65. The only hardship he identifies is the likelihood that, if the Board denies his second application, he will be forced to litigate his claim initially in the Michigan state courts, which, he says, "fail[] adequately to protect individuals' constitutional rights." Compl. ¶ 24. That, however, is not the type of immediate hardship that makes a claim justiciable, and indeed he cites no case law saying that it is. Even if he must file a second claim in the state courts, that does not mean he must end his challenge there, as the United States Supreme Court has certiorari jurisdiction over federal questions resolved by the state courts. *See* 28 U.S.C. § 1257(a). In the end, while "[t]he ripeness doctrine" may "dovetail neatly" with other doctrines (like *Rooker-Feldman*) that limit lower-federal-court review of state court decisions, that reality by itself gives us no warrant to sidestep the traditional ripeness requirements for bringing a claim in federal court. *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 60 (1993).

The ripeness doctrine, it is true, "is somewhat relaxed in the First Amendment context," *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002), but even that does not help Lawrence. To prevail, Lawrence must show not only that the Board will deny him admission to the Bar but also that it will do so based on speech protected by the First Amendment. Because we do not know what action the Board will take on a potential second application—much less the reasons it will give for that action—we have no basis for applying a relaxed ripeness standard here. *See id.* at 554–55 (holding that, even under the "somewhat relaxed" ripeness standard of the First Amendment, a claim is not ripe for review where the plaintiffs could not show a credible fear of enforcement, where the factual record was insufficient to permit review and where withholding judicial relief would not cause undue hardship); *see also, e.g.*, *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478–79 (2d Cir. 1999) (holding that, even under the relaxed ripeness standard of the First Amendment, claims were not ripe for review where the claims were "all highly fact-specific and, as of yet,

hypothetical" and where the plaintiff could not establish a credible fear of enforcement); *Pearson v. Leavitt*, 189 F. App'x 161, 163 (4th Cir. June 23, 2006) (holding that, even under the "relaxed" ripeness standard of the First Amendment, "[i]f certain critical facts that would substantially assist the court in making its determination are contingent or unknown, the case is not ripe for judicial review").